UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN JONES (#162751),

       Plaintiff,

                       CASE NO. 2:10-CV-12114-DT
                       JUDGE ARTHUR J. TARNOW
                       MAGISTRATE JUDGE PAUL J. KOMIVES

  v.

PATRICIA BARNHART,
DEWAYNE BURTON,
THUMB CORRECTIONAL
FACILITY HEALTH CARE,
GERALDINE WILSON and
RANDEE REWERTS,

       Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS BURTON,
REWERTS AND WILSON'S NOVEMBER 8, 2010 MOTION FOR SUMMARY
JUDGMENT (Doc. Ent. 19)**

I.      **RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.     Defendants Burton, Rewerts and Wilson have appeared. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.     Defendants Rewerts, Wilson and Burton Have Filed a Motion for Summary Judgment. . . . . . . 3
     C.     Defendants Barnhart and TCF Health Care have not appeared. . . . . . . . . . . . . . . . . . . . . . . . 4
     D.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          1.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          2.     Plaintiff's Grievances **TCF-09-10-07010-3B** & **TCF-09-11-00724-012E** . . . . . . . . . . 11
          3.     Defendants Burton, Rewerts and Wilson's Affidavits . . . . . . . . . . . . . . . . . . . . . . . . 12
          4.     Defendants Burton, Rewerts and Wilson's motion for summary judgment should be
              granted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
              a.     Defendants Burton, Rewerts and Wilson are entitled to summary judgment on
                   plaintiff's Eighth Amendment claims against them. . . . . . . . . . . . . . . . . . . . . 14
              b.     Defendants Burton, Rewerts and Wilson are entitled to summary judgment on
                   plaintiff's ADA claim against them in their individual capacities. . . . . . . . . . 33
              c.     The Court need not address the issue of defendants Burton, Rewerts and
                   Wilson's entitlement to qualified immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.      **RECOMMENDATION:** The Court should grant defendants Burton, Rewerts and

Wilson's November 8, 2010 motion for summary judgment.  Doc. Ent. 19.  Furthermore, the

Court should renew my March 23, 2011 order (Doc. Ent. 27) regarding service upon defendants

Barnhart and TCF Healthcare.

II.     **REPORT:**

A.      **Defendants Burton, Rewerts and Wilson have appeared.**

Plaintiff John Jones (#162751) is currently incarcerated at the Thumb Correctional

Facility (TCF), where he is serving a life sentence for a September 18, 1987 murder in the first

degree.  *See* www.michigan.gov/corrections, "Offender Search."

On May 26, 2010, while assigned to TCF, plaintiff filed this verified civil rights

complaint.  Doc. Ent. 1 at 1-13.[1]  Defendants are Patricia Barnhart (TCF Warden), Dewayne

Burton (TCF Acting Deputy Warden [ADW]), TCF Health Care, Geraldine Wilson (TCF

Resident Unit Manager [RUM]) and Randee Rewerts (Administrative Officer/Business

Manager).  Doc. Ent. 1 at 3-4 ¶¶ 3-7.[2]  He seeks declaratory, compensatory, injunctive and

punitive relief.  Doc. Ent. 1 at 3, 12.

On June 18, 2010, the U.S. Marshal received five (5) sets of documents for service of

process.  Doc. Ent. 8.  The U.S. Marshal attempted service by mail on July 1, 2010 and/or July 8,

---

[1]He attached Exhibits A-L to his complaint.  Doc. Ent. 1 at 14-47.

[2]Along with his complaint, plaintiff filed a prisoner trust fund account statement.  Doc.
Ent. 2.  On June 3, 2010, Magistrate Judge Whalen entered an order of deficiency based on
plaintiff's "fail[ure] to pay the filing fee or to apply in the manner required by law to proceed in
forma pauperis."  Doc. Ent. 4.
        On June 14, 2010, plaintiff filed an application to proceed in forma pauperis.  Doc. Ent.
5.  On June 17, 2010, Magistrate Judge Whalen entered orders granting plaintiff's application
(Doc. Ent. 6) and directing service without prepayment of costs and authorizing the U.S. Marshal
to collect costs after service is made (Doc. Ent. 7).

2010.

Appearances have been filed on behalf of defendants Rewerts, Wilson and Burton. Doc. Entries 11 and 14. On October 20, 2010, Judge Tarnow entered an order granting defendants' Rewerts and Wilson's motions for enlargement of time (Doc. Entries 12 and 13). Doc. Ent. 17. On the same day, Judge Tarnow entered an order granting defendant Burton's motion for enlargement of time (Doc. Ent. 15). Doc. Ent. 16.

**B.    Defendants Rewerts, Wilson and Burton Have Filed a Motion for Summary Judgment.**

Currently before the Court is defendants Rewerts, Wilson and Burton's November 8, 2010,[3] motion for summary judgment (Doc. Ent. 19).[4] Therein, defendants frame the following issues:

> I.    Where Plaintiff claims that Defendants violated his Eighth Amendment rights by allegedly denying him medical treatment for a bladder infection and toothache but does not show that Defendants acted wantonly, recklessly, knowingly, and unreasonably in disregarding an objectively intolerable risk of harm nor that Defendants knew of and disregarded an excessive risk to inmate health or safety, did Defendants violate Plaintiff's Eighth Amendment rights?

---

[3] Pursuant to Judge Tarnow's October 20, 2010 orders, defendants Rewerts, Wilson and Burton had until November 8, 2010 to respond to plaintiff's complaint. Doc. Entries 16 and 17.

[4] Defendants also filed a related motion to seal documents (Doc. Ent. 20). On March 23, 2011, I entered an order (Doc. Ent. 26) granting in part the motion to seal motion for summary judgment (Doc. Ent. 20). Plaintiff filed an objection (Doc. Ent. 28) to my order; however, Judge Tarnow has overruled the objection and adopted my order. Doc. Ent. 29.

On May 13, 2011, I entered an order requiring defendants to file Exhibit 6 (plaintiff's medical records) under seal by the close of business on Tuesday, May 17, 2011. Doc. Ent. 30. On that day, defendants filed a motion for extending time (Doc. Ent. 31). I entered an order granting this motion and extending the due date to June 17, 2011 (Doc. Ent. 32).

On June 3, 2011, defendants filed plaintiff's medical records (from July 2009 to January 2010) as a sealed exhibit. Doc. Ent. 34 at 1-45; Doc. Ent. 34-1 (Certificate of Service upon Plaintiff at TCF).

3

II.     Where Plaintiff made a claim against Defendants citing the American with Disabilities Act (ADA), but there is no individual liability under the ADA, are Defendants entitled to summary judgment?

III.    Where Defendants are Michigan Department of Corrections' employees acting in their official capacities and have not violated any of Plaintiff's clearly established rights, are Defendants entitled [to] qualified immunity?

Doc. Ent. 19 at 4.

On November 18, 2010, plaintiff filed a request for a sixty (60) day extension of time within which to file a response to defendants' motion. Doc. Ent. 22. His request was based on the assertions that (1) defendants had cited several cases which he needed to review; (2) plaintiff was only permitted six hours per week in the law library; and (3) the law library was scheduled to be closed for several days during November and December due to the upcoming holidays.

The Court did not directly rule on plaintiff's request. However, pursuant to my December 8, 2010 order (Doc. Ent. 23), plaintiff had until December 31, 2010 by which to file a response. Plaintiff filed a verified response on December 14, 2010. Doc. Ent. 25 at 1-8. *See also* Doc. Ent. 25 at 9-18 (Exhibits A-D).

Judge Tarnow has referred this case to me to conduct all pretrial matters. Doc. Ent. 18.[5]

## C.    Defendants Barnhart and TCF Health Care have not appeared.

On the same day plaintiff filed his response, he also filed a motion requesting entry of default judgment upon defendants Barnhart and TCF Health Care. Doc. Ent. 24. On March 23, 2011, I entered an order (Doc. Ent. 27) denying without prejudice plaintiff's motion requesting entry of default judgment (Doc. Ent. 24) and directing the U.S. Marshal to serve defendants

_____

[5]On November 9, 2010, I entered an order (Doc. Ent. 21) denying without prejudice plaintiff's requests for the appointment of counsel (Doc. Entries 3 and 10).

4

Barnhart and TCF health care.  In so doing, I noted:

> The docket sheet fails to establish that these two defendants have in fact been
> served[.]  It only establishes that the Marshal mailed a copy of the complaint to all
> of the defendants.  It fails to reflect that these two defendants actually received a
> copy of the complaint because there has been no waiver of service returned to the
> Marshal.  Nor have the papers supposedly sent to these two defendants been
> returned unexecuted.  However the Court will order the United States Marshal to
> continue in his effort to effect service upon these two defendants. Assistant
> Attorney General Scott R. Rothermel, who has filed an appearance on behalf of
> defendants Burton, Rewerts and Wilson, is requested to furnish the Marshal with
> addresses at which defendants Barnhart and TCF Health Care are presently
> located and may be sent the pleadings requesting a waiver of service.  The Court
> notes that a party who unreasonably fails to execute a waiver of service may be
> assessed the actual costs of service which is thereafter accomplished in person.
> Fed. R. Civ. P. 4(d)(2).

Doc. Ent. 27 at 2-3.

For whatever reason, it does not appear that any such attempt at service has taken place.[6]

**D.      Analysis**

**1.      Factual Background**

Plaintiff claims he is "a paraplegic from a gunshot wound that was sustained upon him on

May 18, 1984."  Doc. Ent. 1 ¶ 2.  According to plaintiff, he was transferred to TCF on March 20,

2002, at which time he was placed in unit "Cord A."  In June 2005, plaintiff was moved from

"Cord A" to unit "Auburn B."  Doc. Ent. 1 ¶ 3.

An MDOC Special Accommodation Notice indicates that on September 19, 2005, Nurse

Ferrier ordered that an attendant was to assist plaintiff with meal access and other movement

inside the institution.  Furthermore, the attendant was not to feed or lift plaintiff, or to perform

elements of personal hygiene.  Dr. Burtch renewed these orders on October 9, 2008.  Doc. Ent. 1

---

[6]However, the docket indicates that the May 17, 2011 motion for extension (Doc. Ent.
31) and the June 3, 2011 sealed exhibit (Doc. Ent. 34) were filed on Barnhart's behalf.

at 47 (Exhibit L).

On July 22, 2009 and July 28, 2009, plaintiff completed medical kites.  The July 26, 2009 kite response from Nurse Haener indicates that plaintiff was scheduled for sick call on or about August 3, 2009, and that catheter supplies would be given out on the first Monday of the month.  Doc. Ent. 34 at 41.  The July 28, 2009 kite response from Nurse Lomerson indicates that plaintiff was scheduled for an August 3, 2009 pick up of his catheter supplies.  Doc. Ent. 34 at 40.  Nurse Haener's August 1, 2009 progress note indicates that catheter supplies are given out on the first Monday of the month.  Doc. Ent. 34 at 41.  The first Monday of August 2009 was August 3rd.

At some point during August 2009, the Auburn Unit elevator did not function.  According to plaintiff, the "Auburn" elevator broke down on August 17, 2009, and on August 19, 2009, it was determined that the "Auburn" elevator would have to be replaced.  Doc. Ent. 1 ¶¶ 3, 4, 37.  On August 20, 2009, plaintiff was informed that "he was not to leave the unit under [any] circumstances per [RUM] Wilson[,] [including] all health care call-outs, and all work assignments, until the elevator was either repaired, or replaced."  Doc. Ent. 1 ¶ 5.  However, defendants contend that it was on August 21, 2009 that "the elevator in Plaintiff's unit (Auburn Unit) stopped working[.]" Doc. Ent. 19 at 7; Doc. Ent. 19-3 ¶ 2; Doc. Ent. 19-4 ¶ 2.

Meanwhile, on August 19, 2009, plaintiff complained of UTI symptoms.  That same day, plaintiff had a "urine dipstick" done, and it was positive for nitrites and leukocytes.  On the same day, Paula J. Mass, PA, ordered Cipro (500 mg twice per day for 10 days) and a urine culture.  Claire G. June, RT, collected plaintiff's urine sample, and it was sent to an off-site laboratory.  Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 35 (Lab Collection Summary), 36 (Orders Summary), 37-38 (Progress Notes).

On August 21, 2009, plaintiff received diagnostic testing (lab work).  Doc. Ent. 34 at 4 & 44-45 (Urine Culture Report).  Plaintiff claims that the urine culture test received on August 23, 2009 revealed a bladder infection.  Doc. Ent. 1 ¶ 22.  Physician's Assistant Mass signed the results on September 4, 2009, noted that plaintiff had an infection, and ordered a follow up culture "to make sure [it is] clear[,] [because] the Cipro should have worked[.]"  Doc. Ent. 1 at 41 (Exhibit I), Doc. Ent. 1 ¶ 23; Doc. Ent. 34 at 4 (Mass's 09/04/2009 Diagnostic Testing Result Notification).  The urine culture, as well as the other labs Mass ordered, were to be scheduled approximately September 4, 2009.  Doc. Ent. 34 at 34 (Mass's 09/04/2009 Orders Summary).

According to plaintiff, he was scheduled for a September 14, 2009 urine culture test.  Doc. Ent. 1 at 27 (Exhibit D), Doc. Ent. 1 at 45 (Exhibit K).  Plaintiff missed his September 16, 2009 appointment for lab collection, because he was "[t]old by his ARUS, RUM, and the Warden not [to] leave his unit, unless it was an emergency."  Doc. Ent. 1 at 39 (Exhibit H); Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 33 (MDOC No Show Summary, Claire G. June, RT).

On September 21, 2009, HUM Dolinski electronically mailed the Assistant Warden (Barnhart), the Assistant Deputy Warden and the transfer coordinator (Powell) to clarify this information.  Apparently, plaintiff "was a no show twice for lab call-out, two consecutive weeks."  Doc. Ent. 1 at 37.[7]

On or about September 21, 2009, plaintiff completed a medical kite for catheter supplies.

---

[7]According to the December 8, 2009 grievance response in TCF-00724 (Doc. Ent. 1 at 37), "[i]n September 2009 R.N. Walker was notified that the Auburn elevator was going to have a delay in repair."  Dolinski "was notified of [the] elevator problem while consulted with . . . Barnhart & transfer coordinator Powell.  RUM G. Wilson was also consulted to discuss an alternate plan to provide health care needs (eg lab) to the Handicap[ped] prisoner in Auburn unit."  Doc. Ent. 1 at 37.

Nurse Haener's kite response is dated September 22, 2009. The items were delivered to plaintiff on the unit by a nurse, and plaintiff was scheduled for sick call on or about October 5, 2009. Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 31-32.

On September 27, 2009, plaintiff completed a health care request (kite) for "urgent" dental treatment based upon pain in a lower back tooth. He was scheduled for an October 1, 2009 dental call-out. Doc. Ent. 1 ¶ 10, Doc. Ent. 1 at 24-25 (Exhibit C). According to plaintiff, he was denied access to health care on October 1, 2009. Doc. Ent. 1 ¶ 24.

Plaintiff also claims he was denied access to his October 5, 2009 appointment by Wilson. Doc. Ent. 1 at 18 (TCF-07010). Plaintiff claims that "[f]or 60 days [he] was confined to the housing unit with no way out of the unit in case of a fire, and in need of medical assistance. Plaintiff was instructed not to leave the housing unit by . . . defendants." Doc. Ent. 1 ¶ 6. Plaintiff claims that he "had several call-outs to health care, and his work assignment that he could not attend to due to the elevator was not in working condition. For 60 days [he] had to suffer with a bladder infection, and a tooth ache, because he was denied access to health care by . . . defendants." Furthermore, he notes, "there was no wheelchair ramp in the unit for plaintiff to escape or an emergency exit in case of a fire, or any other emergency needs!" Doc. Ent. 1 ¶ 7.

On October 16, 2009, plaintiff was moved from "Auburn" unit to "Cord" unit, because "the elevator was still not in working condition[,]" and so that "his handicap needs could be met." Doc. Ent. 1 ¶¶ 3, 8; Doc. Ent. 1 at 37 (Exhibit G). According to plaintiff, "Cord unit is equipped with an elevator for inmates in wheelchairs." Plaintiff contends that "[t]his matter could have been avoided if the defendants would have moved the plaintiff right away[,] [*i.e.*, when they were informed that the elevator had to be replaced with a new one], so he could have

8

received medical treatment!  There was a possibility that the dentist could have saved plaintiff's tooth with immediate medical attention."  Doc. Ent. 1 ¶ 8.

On October 22, 2009, plaintiff completed a health care request (kite) for medical treatment, because he thought he had a bladder infection.  An appointment was scheduled for October 26, 2009.  Doc. Ent. 1 at 45 (Exhibit K), Doc. Ent. 1 ¶ 26.

On October 31, 2009, plaintiff completed a medical kite requesting that his missed appointment with the medical provider be rescheduled.  Doc. Ent. 1 at 37 (Exhibit G).  Nurse Qualman's November 1, 2009 kite response notes that plaintiff was scheduled for sick call on or about November 10, 2009.  Doc. Ent. 34 at 30.

Plaintiff was seen by Mass on November 10, 2009 in TCF's Disability - MSP Chronic Care Clinic, at which time plaintiff thought he still had a UTI.  Mass assessed plaintiff's status as having worsened. Doc. Ent. 34 at 25-27.  Mass ordered several lab tests and follow up visits, and she prescribed Cipro 500 mg twice daily for fifteen (15) days.  Doc. Ent. 34 at 28-29; Doc. Ent. 25 at 15; Doc. Ent. 1 ¶ 9.  That same day, Claire G. June, RT, collected plaintiff's urine culture, and it was sent to an off-site laboratory.  Doc. Ent. 34 at 24, 45 (Urine Culture Report).  Additionally, plaintiff saw Nurse Qualman for an Annual Health Screening, a Special Needs Identification Screening and a TB Control.  Doc. Ent. 34 at 20-21, 22, 23.

Plaintiff was also seen by Mass on November 16, 2009 for a blood pressure check, but his urine culture showed the need for an additional antibiotic.  Mass prescribed Amoxicillin 500 mg three times daily for ten (10) days and ordered a urine culture for approximately December 4, 2009.  The plan included kiting as needed.  Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 18-19; Doc. Ent. 25 at 15 (Exhibit C).  Plaintiff saw the dietitian on November 18, 2009 for education

9

on HTN and cardiac diet.  Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 17.

On November 19, 2009, plaintiff was seen for an emergency extraction of tooth #31.

Doc. Ent. 1 at 22 (Exhibit B).  According to plaintiff, an x-ray was performed, and "the dentist

informed the plaintiff that he had a dental abscess infection, and the tooth had to come out

because it could not be saved."  Doc. Ent. 1 ¶ 10.

It appears a surgical removal of tooth #30 may have occurred on or about November 23,

2009.  Doc. Ent. 34 at 6; *see also* Doc. Ent. 34 at 16 (blood pressure check by Natasha M.

Jones).  On November 30, 2009, Karen S. Malicoat, RN, checked plaintiff's blood pressure.

Doc. Ent. 34 at 15.

On December 7, 2009, several lab tests were performed (CBC, Prostate Specific AG,

Cardiac Panel, Comprehensive Profile and Urine Culture).  Doc. Ent. 34 at 3, 14 & 42-44.  On

January 5, 2010, Mass noted that plaintiff's December 7, 2009 labs showed an increased Prostate

Specific Antigen (PSA),[8] and Mass ordered a follow up visit with an MSP on or about January

13, 2010.  Doc. Ent. 34 at 3, 9-10.  Plaintiff was seen by Mass on December 21, 2009 to evaluate

his urinary tract infection symptoms, at which time he denied URI symptoms except for

occasional slight dysuria.  Mass assessed plaintiff with hypertension (HTN), and she ordered an

MSP visit for approximately January 13, 2010, apparently to recheck plaintiff's blood pressure.

Plaintiff was to notify health care if he had increased UTI symptoms.  Doc. Ent. 34 at 11-12.

On January 15, 2010, Mass apparently assessed plaintiff as having Hypertension (HTN),

and she prescribed Norvasc (10mg daily) and Psyllium (powder).  The plan included following

---

[8]It also appears that plaintiff's LDH and Uric Acid observed values were outside of the
reference range.  Doc. Ent. 34 at 43 (Comprehensive Profile).

up in one month or kiting as needed.  Doc. Ent. 34 at 5, 8.  Mass's notes from January 15, 2010

indicate that plaintiff had no urinary symptoms.  Doc. Ent. 34 at 8.  On January 19, 2010, Mass

ordered Psyllium.  Doc. Ent. 34 at 7.

According to plaintiff, the "Auburn" elevator was repaired on March 4, 2010.  Doc. Ent.

1 ¶ 37.

**2.     Plaintiff's Grievances TCF-09-10-07010-3B** & **TCF-09-11-00724-012E**

Attached to plaintiff's complaint are two (2) sets of grievance materials.  In **TCF-09-10-**

**07010-3B**, plaintiff complained, among other things, that he was denied his September 14, 2009

lab work call-out and his October 1, 2009 dental appointment due to the "Auburn" elevator not

working.  In the November 6, 2009 Step I grievance response, which was reviewed by ADW K.

Corrigan, RUM G. Wilson stated:

> Per ARUS Hopkins she personally spoke to inmate Jones about the elevator being
> broke[n] and there was no time line given to when it would be repaired.  Inmate
> Jones told ARUS Hopkins that he wanted to stay in the unit.  He was told by
> ARUS Hopkins that he would be provided meals in until it was repaired.  As soon
> as information was found out that the elevator had to go out for bid to be repaired
> and that it would be an extended wait on it inmate Jones was moved to another
> unit which was elevator accessible.  At no time was inmate Jones denied access to
> healthcare needs.  A nurse made rounds in Auburn Unit twice a day to see another
> inmate housed in Auburn Unit.  Jones could have approached her at any time to
> request assistance if he needed it.  I also made rounds, inmate Jones never
> approached me or ARUS Hopkins to state he was being denied medical attention
> or he had appointments he needed to attend.  If inmate Jones would have told
> ARUS Hopkins or myself that he had healthcare appointments, arrangements
> would have been made so that he could have attended those appointments.
> Inmat[es] are aware that they have appointments well in advance and if there was
> an issue with him making his appointments myself or ARUS Hopkins would have
> dealt with it swiftly if it had been brought to our attention.

Plaintiff completed a Step II grievance appeal, to which Warden Bergh responded on December

16, 2009:

A nurse made twice daily rounds to accommodate prisoners' needs. Dental Clinic confirmed prisoner Jones never had a 10-1-09 appointment. He was seen on 11-19-09 for an emergency extraction of tooth #31. This is not a wisdom tooth and the tooth was extracted in accordance with PD 04.06.150C APA. The infected tooth cou[l]d not be saved. A routine lab appointment was rescheduled without consequence. He claims to have had a bladder infection for 45 days yet failed to submit either a routine or urgent kite and did not . . . notify staff of a medical concern. Bladder and urinary tract related infections are a common occurrence in patients who self cath and not indicative of any alleged lack of medial attention. His allegations referencing fire drills is a moot point as the removal of handicapped prisoners is simulated during a fire drill. In the event of an actual fire handicapped prisoners would be manually removed from the unit as the elevators cannot be operated during a fire.

Plaintiff completed a Step III grievance appeal on December 29, 2009. *See* Doc. Ent. 1 at 15-20

(Exhibit A), Doc. Ent. 1 at 22 (Exhibit B).[9]

In **TCF-09-11-00724-012E**, plaintiff filed a grievance against TCF health care for

deliberate indifference to his serious medical needs. The December 8, 2009 Step I grievance

response details a time line from August 16, 2009 to November 18, 2009. Plaintiff completed a

Step II grievance appeal, to which Charles Mangus, R.N., responded on February 8, 2010,

encouraging plaintiff "to access health care through the kite process to address any current health

care concerns." Plaintiff completed a Step III grievance appeal. *See* Doc. Ent. 1 at 31-35

(Exhibit F), Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 25 at 10 (Exhibit A).[10]

**3.      Defendants Burton, Rewerts and Wilson's Affidavits**

Defendants have provided several affidavits in support of their motion. TCF RUM

Geraldine Wilson attests that she "told Plaintiff that he could not go to the yard or have other

inmates carry his wheelchair for him while the elevator was broken." Doc. Ent. 19-3 ¶ 3.

---

[9]*See also* Doc. Ent. 1 ¶¶ 16-20.

[10]*See also* Doc. Ent. 1 ¶¶ 21, 25.

Wilson also attests that she "did not instruct Plaintiff that he could not go to his health care callouts." Doc. Ent. 19-3 ¶ 4.

TCF Assistant Resident Unit Supervisor (ARUS) Arlinda Hopkins states that she "spoke with disabled prisoners in Auburn Unit, including Plaintiff, and informed them of the elevator problem. [Jones] told [her] that, regardless of the broken elevator, he wished to stay in his cell in Auburn Unit." Doc. Ent. 19-4 ¶ 3.[11]

Wilson, Hopkins and TCF Administrative Officer Randee Rewerts, each attest that "[f]rom August 21, 2009, when the elevator broke in Auburn Unit until Plaintiff was moved from Auburn to Cord Unit at TCF on October 16, 2009, I conducted rounds in Auburn Unit. At no time did Plaintiff approach me and complain about a medical condition or claim that he had missed health care call-outs because of the broken elevator." Doc. Entries 19-3 ¶ 5, 19-4 ¶ 4 and 19-5 ¶ 2. They further attested, "I am not involved in the health care of prisoners. I had nothing to do with the medical care provided to Plaintiff." Doc. Entries 19-3 ¶ 6, 19-4 ¶ 5 and 19-5 ¶ 3.

DeWayne Burton was a TCF ADW at the time relevant to this case. Doc. Ent. 19-6 ¶ 1. Burton attests that he "do[es] not recall Plaintiff ever approaching [him] and complaining about a medical condition or claim that he had missed health care call-outs because of the broken elevator in his unit[,]" he "[is] not involved in the health care of prisoners[,]" and he "had nothing to do with the medical care provided to Plaintiff." Doc. Ent. 19-6 ¶¶ 2, 3.

## 4.    Defendants Burton, Rewerts and Wilson's motion for summary judgment should be granted.

---

[11]Plaintiff's December 14, 2010 filing seems to suggest that Hopkins is a defendant in this case and that defendants' November 8, 2010 dispositive motion was filed in part on her behalf. Doc. Ent. 25 at 1 ¶ 2.

Plaintiff's claims against defendants are based upon Eighth Amendment deliberate indifference to serious medical needs and the Americans with Disabilities Act (ADA).  Doc. Ent. 1 ¶¶ 15, 27-28, 30, 34, 39, 40.[12]

**a.    Defendants Burton, Rewerts and Wilson are entitled to summary judgment on plaintiff's Eighth Amendment claims against them.**

**I.    Eighth Amendment deliberate indifference to a serious medical need:**  The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]'"  *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)).

In his complaint, plaintiff alleges that defendants were deliberately indifferent to his serious medical needs, citing *Estelle v. Gamble*, 429 U.S. 97 (1976).  Doc. Ent. 1 at 4 ¶ 1.  In *Estelle*, the Supreme Court concluded:  "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of

---

[12]Plaintiff mentions the Fourteenth Amendment in several paragraphs of his complaint. Doc. Ent. 1 ¶¶ 15, 30, 34, 40.  For example, plaintiff sues "under the Fourteenth Amendment, Commitment and treatment for the handicapped."  Doc. Ent. 1 ¶¶ 15, 34.  However, this report and recommendation assumes that plaintiff does not intend to bring a Fourteenth Amendment claim which is independent of his Eighth Amendment deliberate indifference and ADA claims.

action under [42 U.S.C. §] 1983." *Estelle*, 429 U.S. at 104-105 (internal citations and footnotes omitted).

Eighth Amendment claims of deliberate indifference to a serious medical need must satisfy both an objective and a subjective test. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991). The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *McMillian*, 503 U.S. at 8-9; *Rhodes*, 452 U.S. at 349 (1981). To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 349. The objective component is contextually driven and is responsive to "'contemporary standards of decency.'" *McMillian*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 103).

The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton." *Wilson*, 501 U.S. at 302; *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson*, 501 U.S. at 302-03; *see Estelle*, 429 U.S. at 104-06. Under this "deliberate indifference" standard,

> a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Farmer*, 511 U.S. at 847.

**ii.    Plaintiff's Eighth Amendment claim:** Citing *Estelle*, Plaintiff claims that "[t]he sum and substance of this lawsuit is the fact that the defendants acted under color of state law; that they were deliberate[ly] indifferen[t] to serious medical needs of [the] plaintiff." Doc. Ent. 1 at 4 ¶ 1.

Plaintiff claims that his dental request was dated September 27, 2009 (Doc. Ent. 1 at 24-25 (Exhibit C)), but that he was not seen until November 19, 2009 (Doc. Ent. 1 at 22 (Exhibit B), at which point the tooth had to be removed because it could not be saved.  Doc. Ent. 1 ¶ 10.

Plaintiff claims that defendants "did not attempt to rectify this major situation that dealt with plaintiff's medical needs to the utmost degree."  Doc. Ent. 1 ¶ 11.  Furthermore, his "condition seems to only get worse from the deliberate indifference, and lack of proper medical treatment."  Doc. Ent. 1 ¶ 12.

Presumably referring to the period from the mid-August 2009 breakdown of the "Auburn" elevator to his October 16, 2009 move from "Auburn" to "Cord," plaintiff claims he went approximately sixty (60) days or more "with a bladder infection, and about the same amount of time with a tooth ache[,]" and that defendants were "aware of plaintiff's outcry for medical attention."  Plaintiff asserts that defendants denied him access to health care, which resulted in a bladder infection (which required a prescription) and an abscessed tooth (which had to be removed).  According to plaintiff, untreated bladder infections are the leading cause of death in paraplegics.  Doc. Ent. 1 ¶ 14.

As for Warden Bergh's December 16, 2009 Step II Grievance Appeal Response (Doc. Ent. 1 at 2), plaintiff appears to allege that his lab test call out scheduled for September 14, 2009 (Doc. Ent. 1 at 27) was preceded by a medical kite regarding plaintiff's bladder infection; the September 14, 2009 appointment for lab work was scheduled; and "[p]laintiff was denied to go to that appointment[.]" Doc. Ent. 1 ¶ 18.

Plaintiff claims that he "had several health care call-outs, but was denied access to health care by these defendants."  Doc. Ent. 1 ¶ 21.  Plaintiff claims that when defendants were

informed that he missed his September 16, 2009 appointment (Doc. Ent. 1 at 39 (Exhibit H);

Doc. Ent. 34 at 33) because "the elevator was not working[,]" health care could have come to

Auburn Unit, performed a dipstick urine test, sent the material to the lab and ordered the

antibiotics when the results were received.  Doc. Ent. 1 ¶ 22.  He also claims that the follow up

ordered by physician assistant Mass on September 4, 2009 (Doc. Ent. 1 at 41 (Exhibit I)) was not

done; therefore, his bladder infection worsened.  Doc. Ent. 1 ¶ 23.  He further claims to have

spoken with nurse Smith regarding his bladder infection symptoms, but she "stated that there

was nothing that she could do because plaintiff was not allowed to leave the unit for treatment."

According to plaintiff, Officer Gooch can verify this conversation.  Doc. Ent. 1 ¶ 25.

    With respect to his toothache, plaintiff claims he was in pain when he was denied access

to health care on October 1, 2009.  According to plaintiff, the dental abscess can make it painful

to eat.  In support of his claim that immediate medical treatment could have saved his tooth,

plaintiff provides Dental Abscesses information.  Doc. Ent. 1 ¶ 24, Doc. Ent. 1 at 43 (Exhibit J).

    Plaintiff also notes that his kite regarding medical treatment for a bladder infection was

dated October 22, 2009 and an appointment was scheduled for October 26, 2009 (Doc. Ent. 1 at

45 (Exhibit K), but he was not seen for medical treatment until November 10, 2009 (Doc. Ent. 1

at 37 (Exhibit G)).  Doc. Ent. 1 ¶ 26.

    Plaintiff claims the TCF medical staff "were [surely] aware of plaintiff's condition and

need for medical attention, as well [as] that something needed to be done about getting plaintiff

access to health care when he was in need of medical attention."  Doc. Ent. 1 ¶ 31.  According to

plaintiff, "prison officials continued to neglect plaintiff's outcry for proper medical attention[.]"

Doc. Ent. 1 ¶ 32.  And, plaintiff contends, his "condition seems to get worse from the deliberate

17

indifference, and lack of medical treatment." Doc. Ent. 1 ¶ 33.

Plaintiff claims that Rewerts, as the TCF Business Manager, "is responsible for having the unit elevator in working condition[,]" and "was very much aware of plaintiff's situation not being able to leave the unit, due to the elevator [not being] in working condition." Doc. Ent. 1 ¶ 37.

Also, plaintiff takes issue with the December 16, 2009 grievance response (Doc. Ent. 1 at 22 (Exhibit B)), noting that "[w]hen [he] was moved from the unit . . . [Barnhart] ordered an inmate to bring the plaintiff up the stairs, while still in his wheelchair. This inmate ha[d] no medical training in carrying, or picking up paraplegics!" Citing his special accommodation sheets (Doc. Ent. 1 at 47 (Exhibit L)), plaintiff argues that "[t]here was a possibility that the inmate could have dropped the plaintiff, because he had no medical training in lifting paraplegics." Doc. Ent. 1 ¶ 38.

Finally, plaintiff's Eighth Amendment claim alleges that his rights were violated by defendants' acts or their failure to act. Doc. Ent. 1 ¶ 40.

**iii.   Defendants' arguments:** In *Farmer*, the United States Supreme Court stated that, to survive summary judgment on a claim for "injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm," "[plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so[.]" *Farmer*, 511 U.S. at 845-846.

Defendants contend that "[d]efendants' acts did not amount to 'deliberate indifference' under the Eighth Amendment[,]" and "no reasonable jury could find that Defendants' actions

while the elevator was broken in Plaintiff's unit was 'an objectively intolerable risk of harm.'" Doc. Ent. 19 at 10-11.

Defendants first address the objective component. With respect to the bladder infection, defendants cite the August 19, 2009 physician's assistant notes regarding plaintiff's urinalysis, where Mass noted that plaintiff's urine dipstick test was positive for nitrites and leukocytes, prescribed Cipro and ordered a urine culture (Doc. Ent. 34 at 35-38), and argue that "Plaintiff's bladder infection was immediately addressed by health care." Citing an MDOC "No Show Summary" (Doc. Ent. 34 at 33), defendants argue that "[p]laintiff's only missed medical appointment was on September 16, 2009, for a follow-up lab collection of his urine, but this was more than two weeks after he was scheduled to be done taking antibiotics to cure his bladder infection."[13] Defendants also contend that "there are no kites during the time period in which Plaintiff was in Auburn Unit and the elevator was broken where he complained about a bladder infection or Defendants not allowing him to go to heath care for appointments." And, they contend, plaintiff "never complained to any of the Defendants about a medical condition." Doc. Ent. 19 at 12.

It is defendants' position that plaintiff's bladder infection was not a serious medical need, because (1) it was immediately addressed and (2) "given the lack of kites from Plaintiff," the bladder infection "was apparently cured during the time the elevator was broken." Doc. Ent. 19 at 12.

With respect to the toothache, defendants acknowledge plaintiff's September 27, 2009 health care request (kite) for urgent dental treatment, the response to which states, "watch

---

[13]This contradicts the TCF-00724 December 8, 2009 grievance response that plaintiff "was a no show twice for lab call-out, two consecutive weeks." Doc. Ent. 1 at 37.

callouts[,]" (Doc. Ent. 1 at 24-25 (Exhibit C)).  However, defendants claim that "[t]his kite is not

noted in Plaintiff's medi[c]al records and . . . Plaintiff never complained to any of the Defendants

about a toothache."  Furthermore, defendants doubt that a toothache qualifies as a serious

medical need.  Doc. Ent. 19 at 13.

Defendants next address the subjective component, regarding which defendants make

four (4) arguments: (1) "he never brought either of his alleged medical issues to the attention of

any of the Defendants, did not send any kites regarding a bladder infection or health care, nor

does he proffer any evidence that Defendants ignored requests for medical treatment[;]" (2)

"Defendants were not medical staff and, as such, had nothing to do with the medical care

provided (or alleged lack thereof)[;]" (3) "it is obvious from Plaintiff's medical records that his

bladder infection was promptly and appropriately treated on August 19, 2009, when his urine

tested positive and a physician's assistant proscribed an antibiotic to him[;]" and (4) "there is

nothing in his medical record regarding a toothache."  Doc. Ent. 19 at 13-14.

For these reasons, it is defendants' position that "none of the Defendants could have

possibly possessed a sufficiently culpable state of mind to negatively impact his medical

treatment."  Doc. Ent. 19 at 14.

**iv.     Plaintiff's response:**  Plaintiff appears to contend that he did not say anything

about his medical problems to Wilson, Hopkins, Rewerts or Burton on the basis that plaintiff has

the constitutional right "to retain privacy of his medical conditions, from non-medical

person[nel]."  Doc. Ent. 25 ¶ 4 (referencing *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001)).  And, he

notes that MDOC PD 03.04.100 ["Health Services"] sets forth "how prisoners are to contact

healthcare, and what is healthcare's responsibility to prisoner's confined within segregation."

20

Plaintiff likens the order that he not leave the unit to being placed in segregation.  Plaintiff

contends that TCF "has a responsibility when Plaintiff missed his callouts to investigate."  It is

his position that "[n]o investigation was done, because the defendant, and health care were aware

of Plaintiffs' medical condition, as well as his inability to leave the unit."  Doc. Ent. 25 ¶ 4, Doc.

Ent. 25 at 12-13, 17-18 (Exhibits B & D).

In response to Hopkins's affidavit, plaintiff claims that he "never spoke with Ms.

Hopkins during the time the elevator was broken down[,]" and "[t]here is no evidence to support

her allegation that she made any rounds in the unit to date."  Plaintiff asks, "[w]hy would [he]

agree to stay inside a unit with minimal air circulation, instead of moving to another unit where

he was free to partake in outdoor activities?"  Doc. Ent. 25 ¶ 5.  Furthermore, plaintiff claims

there is no evidence to support Hopkins's statement that plaintiff agreed to remain in Auburn.

Plaintiff explains that the other unit with an elevator "had prisoners assigned to all the handicap

cells[,]" therefore, "Defendants could do nothing but order the plaintiff to stay in the unit."

According to plaintiff, "[h]ousing officers were [reasonably] instructed to write major

misconduct tickets to plaintiff and any inmates attempting to carry plaintiff up the stairs to exit

the unit."  It is plaintiff's position that "the defendants were conceding that they had no other

way for the handicap prisoners to exit the building.  It shows their concern for other prisoners

carrying plaintiff up the stairs."  Therefore, plaintiff claims, "for the defendant to now argue that

no such order was given to plaintiff, if they are doing their job of watching over prisoners, is

ridiculous."  Doc. Ent. 25 ¶ 8.

In response to Burton's affidavit, plaintiff cites his October 2009 Step I grievance in

TCF-09-10-07010-3B (Doc. Ent. 1 at 15 [Exhibit A]), wherein he stated that he had spoken with

Burton and Bills about the subject of his grievance but had not gotten any answers. Plaintiff

claims that, "in response to the grievance, healthcare made Deputy Burton aware of the

plaintiff's medical concerns during the meeting[,]" and "[w]hether Plaintiff informed Deputy

Burton, or healthcare informed him is of no consequence." It is plaintiff's position that Burton

"was made aware of plaintiff's medical concerns, and chose to ignore plaintiff's forced

confinement or inability to seek medical treatment." Doc. Ent. 25 ¶ 6.

     In response to Wilson, Hopkins, Rewerts and Burton's affidavits, plaintiff contends that

defendants can be held liable "for interfering with his ability to seek medical treatment, or

medical staff[,]" referencing *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005)), or

"when they maintain policies, or procedures that interfere with adequate medical treatment."

Doc. Ent. 25 ¶ 7.

     Plaintiff contends that defendants' "failure to have an emergency evacuation plan that

allows handicap prisoners to exit the unit presents a risk of harm." Furthermore, he claims that

"[f]ailing to have staff trained that could safely carry Plaintiff up the stairs so he could seek

medical treatment, is unreasonable." Plaintiff likens these two failures to being in "segregation."

Apparently referring to the "Segregation" section of MDOC PD 03.04.100,[14] plaintiff contends

that "[n]ot having medical staff make medical welfare checks . . . was unreasonable." According

to plaintiff, he made health care aware of his medical problems, but was informed, "there is

nothing [we] can do[,]" which constituted a risk of harm and deliberate indifference. Also,

_____

    [14]In part, this section of the policy provides that "[n]ursing staff shall make daily rounds
in segregation units to collect written requests for health care services from prisoners and to
follow up on health care concerns. Rounds also shall be made at least every two weeks by an
MSP. A QMHP [Qualified Mental Health Professional] shall make rounds in segregation units
as set forth in PD 04.05.120 'Segregation Standards' and PD 04.06.182 'Mentally Ill Prisoners in
Segregation'." MDOC PD 03.04.100 ¶ KK.

plaintiff contends that "[t]he urine test could have been done while in the unit, however, nurse Smith could not be bothered with walking back to health care, returning with a specimen cup and dip stick, and returning to the unit to verify the bladder infection." According to plaintiff, "[t]hat was deliberate indifferen[ce] to plaintiff's health needs, and these defendants are liable for not making subordinates aware of policy, procedures, and provid[ing] adequate training," which places all prisoners at risk. Doc. Ent. 25 ¶ 9.

As for whether defendants knew of plaintiff's serious medical needs, plaintiff responds that he need not show "that defendants knew the precise nature of the risk . . . to be found deliberately indifferent, as long as he demonstrates that a serious risk exists." Doc. Ent. 25 ¶ 10 (referencing *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005)).[15] Plaintiff claims that "[k]eeping Plaintiff locked in a basement cell, with no way to exit the building or seek medical treatment for 60 days, when other options were available is deliberate, and indifferent to plaintiff's needs." Doc. Ent. 25 ¶ 10.

As for the idea that "a medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention[,]'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923

---

[15]*Velez*, 395 F.3d at 736 ("Johnson did not have to know the specifics of the danger to be culpable. Indeed, accepting Johnson's position would essentially reward guards who put their heads in the sand by making them immune from suit-the less a guard knows the better. That view is inconsistent with *Farmer*. What matters is that Johnson was aware of a serious risk of harm in some form, be it assault or the more serious transgression that actually occurred. And just because Velez did not volunteer detailed information does not mean that Johnson was not made aware of a serious risk. Indeed, a jury could well find that the vague nature of Velez's complaint made it even more incumbent on Johnson to investigate further. And as it turned out, Velez could not have provided any more information to Johnson without risking a slashed neck.").

F.2d 203, 208 (1st Cir.1990)), plaintiff asserts that (A) "[b]ladder infections are the leading cause of death for paraplegic individual[s]," (B) "he suffered from, and was being treated insufficiently by the medical staff to cure the infection, and was prevented from follow-up physician care in a timely manner;" and (C) "[a] reasonable jurist can relate to the burning associated from an infection, and relate the pain he was forced to endure for over 60 days."  As for the toothache, plaintiff claims that "a reasonable jurist can associate with a toothache, the pain of eating, or the swelling of the side of plaintiff's face that would require medical attention just from looking at the swelling."  Doc. Ent. 25 ¶ 10.

With respect to defendants' claims that plaintiff "never brought either of his alleged medical issues to the attention of any of the Defendants," Doc. Ent. 19 at 13, plaintiff claims he complied with MDOC PD 03.04.100 ["Health Services"] when he kited on September 27, 2009 regarding his dental issue and was scheduled for an October 1, 2009 appointment.  Plaintiff contends that each of the defendants "[has] access to [his] movement sheets."  Citing the section of MDOC PD 03.04.100 concerning "Failure To Report For A Scheduled Health Services Appointment",[16] plaintiff contends that if defendants did not know the reason for him not going to the callout on October 1, 2009, health care was required to investigate and reschedule the appointment.  It is plaintiff's position that "[t]he fact no one investigated, and no rescheduling took place, confirms that unit officers were following defendant's orders not to let Plaintiff out of the unit."  Doc. Ent. 25 ¶ 11; Doc. Ent. 1 at 24-25 (Exhibit C); Doc. Ent. 25 at 17-18 (Exhibit

---

[16]For example, "Health care staff shall follow-up on all appointments for which the prisoner failed to report (no show).  If rescheduling is necessary, the prisoner shall be seen by an appropriate QHP within a time frame appropriate to the prisoner's condition.  A misconduct report may be written on a prisoner who misses an appointment, when appropriate."  MDOC PD 03.04.100, effective 02/14/05, ¶ AAA.

D).

Relatedly, plaintiff claims that defendants were violating ¶ E of MDOC PD 03.04.100, which provides that "[a]ll prisoners in Correctional Facilities Administration (CFA) institutions shall have access to health services as described in this policy, regardless of custody level or security classification[.]" Plaintiff contends, "[a]pparently, the defendants wish to decide what constitutes medical care."  Doc. Ent. 25 ¶ 12; Doc. Ent. 25 at 12-13 (Exhibit B).

As for defendants' claim that health care immediately addressed plaintiff's bladder infection, in support of which defendants cite the prescription of Cipro from August 19, 2009 to August 29, 2009 (Doc. Ent. 19 at 12; Doc. Ent. 34 at 36-37), plaintiff claims he kited health care on September 8, 2009 and explained that the Cipro was not working, which resulted in the scheduling of the September 16, 2009 follow up appointment.  However, plaintiff claims he "was denied access to that callout as well."  Therefore, plaintiff contends, he was "denied access to medical care for a serious medical condition."  Doc. Ent. 25 ¶ 13.

Plaintiff contends that defendants' "refusal to allow plaintiff to seek medical treatment meant [that] by the time he was moved [from Auburn to Cord unit on October 16, 2009][,] the bladder infection had gotten worse, and plaintiff had been forced to live in pain for 60 days." Plaintiff further responds that he "was finally permitted to see a physicians assistant on [November 10, 2009] when a urine culture was completed, confirmation was given that the infection had worsened to the point that Plaintiff was placed on two different forms of antibiotics."  Doc. Ent. 25 ¶ 14; Doc. Ent. 25 at 14-15 (Exhibit C).

Plaintiff also responds that defendants' "intentional failure to take actions to eliminate or correct these violations constitutes personal involvement for liability under omissions actionable

25

under 42 U.S.C. § 1983."  Doc. Ent. 25 ¶ 16 (citing *Smith v. Ross*, 482 F.2d 33, 36 (6th Cir.

1973)[17] and *Estelle*).

     **v.**    **Conclusion:** This report assumes *arguendo* that the conditions of which plaintiff

complains  - the bladder or urinary tract infection and the toothache or abscessed tooth - are

serious medical needs.  *See, i.e., Wallin v. Norman*, 317 F.3d 558, 562 (6th Cir. 2003) (regarding

a urinary tract infection and a leg infection and affirming a district court's decision denying a

motion to dismiss, "Wallin had properly pled facts sufficient to establish that each of the officials

acted with deliberate indifference to his serious medical needs."); *Franklin v. Zain*, 152 F.3d

783, 784-785 (8th Cir. 1998) ("In her complaint Franklin alleged that 'the acts and conduct of

Defendants' in mistakenly testing for cervical cancer instead of treating the urinary tract

infection constituted deliberate indifference to her serious medical needs[,]" and "the complaint

alleged 'the acts and conduct of Defendants' constituted deliberate indifference to her serious

medical needs."); *but see DeNoyer v. Rogers*, 31 Fed.Appx. 343 (8th Cir. 2002) ("None of

DeNoyer's medical conditions turned out to be serious. The dental problem was resolved when

the abscessed tooth was extracted in early January. . . . Thus, DeNoyer is seeking § 1983

damages of $1,000 per day for the imperfect treatment of conditions that caused him some pain

and discomfort and that might have been serious medical needs. In these circumstances, his

claim is, in essence, that Rogers was negligently inattentive to an inmate's complaints of medical

needs, not that Rogers was deliberately indifferent to an inmate's constitutional right to essential

---

       [17]*Smith*, 482 F.2d at 36-37 ("a law enforcement officer can be liable under § 1983 when
by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and
fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed
them under state or federal law. Acts of omission are actionable in this context to the same extent
as are acts of commission.").

medical care.").

Instead, this report focuses on whether defendants Burton, Rewerts and Wilson were deliberately indifferent to plaintiff's serious medical needs. As for the toothache, plaintiff's urgent dental kite regarding the toothache is dated September 27, 2009; he had a call-out for dental on October 1, 2009, although Warden Bergh later claimed that the Dental Clinic confirmed plaintiff never had an October 1st appointment; and he had an emergency extraction of tooth #31 on November 19, 2009 (and perhaps a removal of tooth #30 on November 23, 2009). Doc. Ent. 1 ¶¶ 10, 24; Doc. Ent. 1 at 22, 24-25; Doc. Ent. 34 at 6.

To the extent plaintiff claims defendants interfered with or denied him access to the October 1, 2009 dental appointment, his claim is conclusory as to the defendants currently before the Court. For example, plaintiff alleges in his complaint:

> When plaintiff was denied access to health care on October 1, 2009[,] Plaintiff was in very much pain! The plaintiff had a dental abscess, which can be very painful when you eat. If the plaintiff would have received medical treatment right away[,] the dentist could have saved his tooth[.]

Doc. Ent. 1 ¶ 24. Also, in response to the instant motion, plaintiff claims:

> Each of these defendants have access to prisoner movement sheets. If defendants had not known the reason for Plaintiff not going to the callout, health care is required to investigate and reschedule. . . . . The fact [that] no one investigated, and no rescheduling took place, confirms that unit officers were following defendant's orders not to let Plaintiff out of the unit.

Doc. Ent. 25 ¶ 11.

None of the defendants bringing the instant motion for summary judgment were health care employees. At the time of the incidents underlying plaintiff's complaint, Burton was a TCF ADW (Doc. Ent. 19-6 ¶ 1); Rewerts was a TCF Administrative Officer (Doc. Ent. 19-5 ¶ 1); and Wilson was a TCF RUM (Doc. Ent. 19-3 ¶ 1). Furthermore, even if Burton, Rewerts and Wilson

27

had plaintiff's October 1, 2009 "Offender Daily Schedule" sheet (Doc. Ent. 1 at 25), this does not mean any of them were aware of the reason behind plaintiff's dental appointment.  As defendants note, "[t]his kite is not noted in Plaintiff's medial records and, as stated above, Plaintiff never complained to any of the Defendants about a toothache."  Doc. Ent. 19 at 13. **Therefore, the Court should conclude that defendants Burton, Rewerts and Wilson were not deliberately indifferent to plaintiff's toothache / abscessed tooth.**

As for the bladder infection, I examine defendants' claims that during the relevant time period, "[p]laintiff's only kite (note) to health care is on September 22, 2009, when he complained about his cath supplies[,]" Doc. Ent. 19 at 8, and "there are no kites during the time period in which Plaintiff was in Auburn Unit and the elevator was broken where he complained about a bladder infection or Defendants not allowing him to go to health care for appointments."  Doc. Ent. 19 at 12.

According to defendants, the Auburn Unit elevator stopped working on August 21, 2009 and plaintiff was moved from Auburn Unit to Cord Unit on October 16, 2009.  Doc. Ent. 19 at 7. Of the four (4) kites discussed,[18] two (2) were dated within this time period - the September 21, 2009 medical kite regarding catheter supplies (Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 32 (09/22/2009 Kite Response)) and the September 27, 2009 urgent dental kite regarding the toothache (Doc. Ent. 1 at 24-25 (Exhibit C)).  The remaining two (2) kites - the October 22, 2009 medical kite regarding a bladder infection (Doc. Ent. 1 at 45 (Exhibit K) and the October 31, 2009 kite regarding a missed appointment (Doc. Ent. 1 at 37 (Exhibit G); Doc. Ent. 34 at 30 (11/01/2009 Kite Response)) - were filed after plaintiff's transfer from Auburn Unit to Cord

---

[18]This figure does not include the July 22, 2009 and July 28, 2009 kites.  See Doc. Ent. 34 at 40-41.

28

Unit.[19]

Putting these health care requests into a time line with plaintiff's sealed medical records (Doc. Ent. 34), I note that a urine dipstick was performed on August 19, 2009, which was positive for nitrites and leukocytes, and Cipro was prescribed on that date (Doc. Ent. 34 at 35-38); a urine culture was performed on August 21, 2009, which revealed an infection (Doc. Ent. 34 at 4, 44);[19] plaintiff's Cipro prescription ended on August 29, 2009 (Doc. Ent. 34 at 36); plaintiff allegedly kited on September 8, 2009, and appears to suggest that this kite was the impetus for his September 16, 2009 appointment (Doc. Ent. 25 ¶ 13); plaintiff was unable to attend the urine culture scheduled for September 16, 2009, because the elevator was not working (Doc. Ent. 1 at 39; Doc. Ent. 34 at 33); on October 16, 2009, he was moved from "Auburn" unit to "Cord" unit (Doc. Ent. 1 at 37); on October 22, 2009, plaintiff completed a health care request regarding a bladder infection (Doc. Ent. 1 at 45); on October 31, 2009 plaintiff completed a health care request asking that his missed appointment be rescheduled (Doc. Ent. 1 at 37, Doc. Ent. 34 at 30); a urine culture was performed on November 10, 2009,[20] and Cipro was prescribed (Doc. Ent. 34 at 45, Doc. Ent. 34 at 28); on November 16, 2009, he was prescribed the additional antibiotic of Amoxicillin (Doc. Ent. 34 at 18-19); the Cipro prescription ended on November 25, 2009 (Doc. Ent. 25 at 15, Doc. Ent. 34 at 28); the Amoxicillin prescription ended on November

_____

[19]In addition to the foregoing, the medical records filed under seal on June 3, 2011 also show Kite Responses from July 28, 2009 regarding a need for catheter supplies (Doc. Ent. 34 at 40) and from July 22 / 26, 2009 regarding a need for catheter supplies (Doc. Ent. 34 at 41).

[19]The urine culture report indicates that the organism proteus mirabilis was isolated. Doc. Ent. 34 at 44.

[20]The urine culture report indicates that three organisms (Klebsiella pneumoniae ssp pneumoniae, beta-hemolytic streptococcus Group B and alpha-hemolytic streptococcus - non-enterococcal) were isolated.  Doc. Ent. 34 at 45.

26, 2009 (Doc. Ent. 25 at 15, Doc. Ent. 34 at 18); and a urine culture was performed on

December 7, 2009 (Doc. Ent. 34 at 44).[21]  *See also* Doc. Ent. 1 at 37 (Exhibit G), Doc. Ent. 1 at

41 (Exhibit I), Doc. Ent. 1 at 27 (Exhibit D), Doc. Ent. 1 at 45 (Exhibit K).

**The Court should conclude that defendants Burton, Rewerts and Wilson were not**

**deliberately indifferent to plaintiff's bladder or urinary tract infection.**  As an initial matter,

the Court should agree with defendants that "Plaintiff's [August 2009] bladder infection was

immediately addressed by health care."  Doc. Ent. 19 at 12.

As for plaintiff's claim that he kited on September 8, 2009, missed the resulting

September 16, 2009 appointment and was not seen until November 10, 2009, plaintiff appears to

contend that he did not say anything about his medical problems to Wilson, Hopkins, Rewerts or

Burton on the basis of privacy (Doc. Ent. 25 ¶ 4).  This is consistent with Wilson, Rewerts and

Burton's claims that, "[a]t no time did Plaintiff approach me and complain about a medical

condition[,]" or that "I do not recall Plaintiff ever approaching me and complaining about a

medical condition[.]"  Doc. Ent. 19-3 ¶ 5; Doc. Ent. 19-5 ¶ 2; Doc. Ent. 19-6 ¶ 2.

Furthermore, Wilson, Rewerts and Burton also claim that "[a]t no time did Plaintiff

approach me and . . . claim that he had missed health care call-outs because of the broken

elevator[,]" or that "I do not recall Plaintiff ever approaching me and . . . claim[ing] that he had

missed health care call-outs because of the broken elevator in his unit."  Doc. Ent. 19-3 ¶ 5; Doc.

Ent. 19-5 ¶ 2; Doc. Ent. 19-6 ¶ 2.  To be sure, plaintiff claims that the August 20, 2009 order to

not to leave his unit under any circumstances was per Wilson.  Doc. Ent. 1 ¶ 5.  However, even if

plaintiff was ordered in August 2009 not to leave the unit - as opposed to remaining there

---

[21]The urine culture report indicates that the organism serratia marcescens was isolated.
Doc. Ent. 34 at 44.

voluntarily (compare Doc. Ent. 25 ¶ 4 with Doc. Ent. 19-4 ¶ 3) - it does not appear that plaintiff

complained to defendants Wilson or Rewerts about his health issues or about his lack of access

to health care from  September 2009 up until his October 16, 2009 transfer from "Auburn" unit

to "Cord" unit.  As for plaintiff's claim that he talked to Burton on October 9, 2009 about the

subject of grievance TCF-07010 - which mentioned the denial of access to his September 14,

2009 and October 1, 2009 appointments (Doc. Ent. 1 at 15-16); that healthcare informed Burton

about the concerns in conjunction with the November 6, 2009 Step I response to that grievance

(Doc. Ent. 1 at 17); and that Burton "was made aware of plaintiff's medical concerns, and chose

to ignore plaintiff's forced confinement or inability to seek medical treatment[,]" Doc. Ent. 25 ¶

6, I note that plaintiff was transferred from "Auburn" to "Cord" on October 16, 2009 - seven (7)

days after plaintiff allegedly spoke with Burton.

Also, plaintiff's claim that there was a responsibility to investigate when he missed his

callout (Doc. Ent. 25 ¶ 4, MDOC PD 03.04.100 ¶ AAA), really relates to health care employees.

The same is true of plaintiff's claims that medical staff did not make medical welfare checks in

accordance with MDOC PD 03.04.100 ¶ KK, or that plaintiff made healthcare aware of his

medical problems but was informed, "there is nothing [we] can do[,]" or that the urine test could

have been done in Auburn Unit (Doc. Ent. 25 ¶ 9).

And, as to plaintiff's related claim that "defendants are liable for not making subordinates

aware of policy, procedures, and provid[ing] adequate training," Doc. Ent. 25 ¶ 9, it is unclear

that the healthcare workers were defendants Wilson, Rewerts and/or Burton's subordinates.

Furthermore, "Section 1983 liability must be premised on more than mere respondeat superior,

the right to control one's employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999).  A

supervisor is not liable under § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982))." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).

Also, to the extent plaintiff argues that "[n]o investigation was done, because the defendant, and health care were aware of Plaintiff's medical condition, as well as his inability to leave the unit[,]" Doc. Ent. 25 ¶ 4, I note Wilson's November 6, 2009 Step I grievance response (TCF-07010), wherein she stated, "[i]f inmate Jones would have told ARUS Hopkins or myself that he had healthcare appointments, arrangements would have been made so that he could have attended those appointments." Doc. Ent. 1 at 17. I also note plaintiff's reference to Nurse Todd Durnan's December 8, 2009 grievance response, which notes in part that, once Nurse Walker was informed in September 2009 that the Auburn elevator would be delayed in repair, "RUM G. Wilson was . . . consulted to discuss an alternate plan to provide health care needs (eg lab) to the Handicap prisoner in Auburn unit." Doc. Ent. 25 at 10 (TCF-00724); Doc. Ent. 1 at 37 (TCF-00724).

Finally, plaintiff's claim against Rewerts is based on the fact that he is the business manager, is responsible for "having the unit elevator in working condition[,]" was "very much aware of plaintiff's situation not being able to leave the unit, due to the elevator [not being] in working condition." Plaintiff also notes that it took almost seven (7) months to repair the elevator. Doc. Ent. 1 ¶ 37. And, in his response, plaintiff points out that he "was restricted to

the unit by a non functioning elevator, and orders of the defendants.  This interfered with adequate medical treatment, which [a]s a direct action of that order, plaintiff's medical condition[] worsened."  Doc. Ent. 25 ¶ 7.

To be sure, deliberate indifference to a serious medical need is prohibited by the Eighth Amendment, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976) (internal footnotes omitted).  Even if plaintiff was ordered to stay in his cell, there is no indication that defendants Rewerts, Burton or Wilson *intentionally* denied or delayed access to plaintiff's medical care of *intentionally* interfered with plaintiff's treatment once it was prescribed.

**b.**    **Defendants Burton, Rewerts and Wilson are entitled to summary judgment on plaintiff's ADA claim against them in their individual capacities.**

**I.**    **Plaintiff's ADA claim:**  The Americans with Disabilities Act of 1990 (ADA) is codified at 42 U.S.C. §§ 12101-12213.  Plaintiff's complaint specifically cites 42 U.S.C. §§ 12131-12134 (Subchapter II: Public Services - Part A.  Prohibition Against Discrimination and Other Generally Applicable Provisions).  Doc. Ent. 1 ¶ 39.

Plaintiff claims that defendants denied him an "escape route out of the prison housing unit in the case of a fire, and or an emergency medical situation."  Plaintiff argues that "persons in wheelchairs must have an emergency exit out in case of a[n] emergency situation like in this case.  In this case plaintiff had no way out, because there were no wheelchair ramp[s] leading out of the unit for means of escape!"  Doc. Ent. 1 ¶ 13.

Attached to plaintiff's complaint is a portion of MDOC PD 04.03.120 ["Fire Safety"].

33

Doc. Ent. 1 at 29 (Exhibit E).  According to plaintiff, Officer Moller instructed plaintiff "to go

back to his cell during the fire drill."  Doc. Ent. 1 ¶ 20.  Plaintiff points out that MDOC PD

04.03.120 provides in part that "[f]ull evacuation of all staff and offenders in the area is required

except in those areas where the Warden has determined that the evacuation of prisoners would

pose a risk to the custody and security of the facility (e.g., segregation unit)."  *Id.* ¶ H.

Plaintiff contends he "is a qualified individual with a disability as defined by the

[ADA]." Doc. Ent. 1 ¶ 27.  Plaintiff claims that corrections departments and other entities that

operate prisons and jails are included in 42 U.S.C. §§ 12131(1) (Public entity).  Doc. Ent. 1 ¶ 28.

Plaintiff argues that "[t]he ADA applies to state prisoners, and prison officials violating the ADA

are liable under 42 U.S.C. [§] 1983."  Doc. Ent. 1 ¶ 29.

Plaintiff alleges that the ADA has been violated by "inadequate living conditions to

accommodate his disability."  Doc. Ent. 1 ¶ 30.  According to plaintiff, "prison officials

continued to neglect [his] outcry for . . . housing facilities for the handicapped."  Doc. Ent. 1 ¶

32.  That his claim is based upon an alleged failure to accommodate is buttressed by his mention

of "treatment for the handicapped."  Doc. Ent. 1 ¶¶ 15, 34.  Plaintiff specifically alleges that

"Rewerts was very much aware of plaintiff's situation not being able to leave the unit, due to the

elevator was not in working condition."  Doc. Ent. 1 ¶ 37.

Citing 42 U.S.C. § 12132 (Discrimination), plaintiff claims that "public entities such as

prisons must grant reasonable requests to accommodate the physical needs of people with

disabilities.  Citing 42 U.S.C. § 12203 (Prohibition against retaliation and coercion), plaintiff

contends that it is "illegal for government employees to retaliate against a person for asserting

their right under the ADA." Doc. Ent. 1 ¶ 39.[22]

With respect to the ADA, plaintiff's complaint cites this Court's decisions in *Niece v. Fitzner*, 922 F.Supp. 1208 (E.D. Mich. March 29, 1996) (Borman, J.) (accepting report and recommendation of Komives, M.J.) and *Niece v. Fitzner*, 941 F.Supp. 1497 (E.D. Mich. Oct. 10, 1996) (Borman, J.) (accepting report and recommendation of Komives, M.J.) . Doc. Ent. 1 ¶ 39. In one of those reports, I stated: "The regulations promulgated by the Department of Justice implementing both section 504 and Title II of the ADA make it clear that they both apply to state prisons." *Niece*, 941 F.Supp. at 1506.

**ii.    Defendants' argument:** Defendants Burton, Rewerts and Wilson rely upon *Lee v. Mich. Parole Bd.*, 104 Fed. Appx. 490, 493 (6th Cir. 2004) ("Lee may not maintain an action under the ADA or the RA against the individual defendants identified in his complaint because neither the ADA nor the RA impose liability upon individuals.") (citing 29 U.S.C. § 794(b)(RA); 42 U.S.C. § 12131(1)(ADA)); *Czupih v. Card Pak Inc.*, 916 F.Supp. 687, 691 (N.D. Ohio 1996) ("this Court cannot agree with the minority's view that Congress intended individuals to be liable under Title VII, as amended by the Civil Rights Act of 1991."); *Carten v. Kent State University*, 282 F.3d 391, 397 (6th Cir. 2002) ("an official who violates Title II of the ADA does not represent 'the state' for purposes of the Eleventh Amendment, yet he or she nevertheless may be

---

[22]Plaintiff's complaint mentions pendant jurisdiction, *see* 28 U.S.C. § 1367 ("Supplemental jurisdiction"), and claims defendants have violated state law. Doc. Ent. 1 at 3 ¶ 1, Doc. Ent. 1 at 6 ¶ 13, Doc. Ent. 1 at 10-11 ¶ 35, Doc. Ent. 1 at 12. Elsewhere, plaintiff claims that defendants "violated the law of conversion and regulation of the guidelines set forth for housing, and treatment of residents in prison facilities with respect to providing plaintiff with adequate medical care." Doc. Ent. 1 ¶ 36.
    However, plaintiff does not specify which state law has been violated. *See*, *i.e.*, Mich. Comp. Laws Chapter 37 ("Persons with Disabilities Civil Rights Act"), Mich. Comp. Laws Chapter 125 ("Utilization of Public Facilities by Physically Limited"). Therefore, this report and recommendation is limited to assessment of plaintiff's federal law, ADA, claim.

held responsible in an official capacity for violating Title II, which by its terms applies only to 'public entit[ies].'");[23] *Nihiser v. Ohio EPA*, 269 F.3d 626, 627-628 (6th Cir. 2001) ("As a state employee suing his employer under Title I, Nihiser's Americans with Disabilities Act claim is governed by *Garrett*.  Therefore, we affirm the district court's dismissal of Nihiser's claim against the Agency for violations of Title I of the Americans with Disabilities Act.").

Relying upon *Lee*, *Czupih*, *Carten* and *Nihiser*, defendants contend that "[t]he ADA does not impose liability upon individuals."  Doc. Ent. 19 at 5, 14.  Therefore, they contend, "Defendants are entitled to summary judgment as to Plaintiff's ADA claims against them."  Doc. Ent. 19 at 14.

**iii.    Conclusion:** Plaintiff responds that "[t]he ADA applies to State Prisoners and Prison Officials violating rules of the ADA are liable under 42 U.S.C. §1983[,]" and "the ADA applies to these defendants in their individual capacity."  Doc. Ent. 25 ¶ 15.

Plaintiff is correct that "[t]he ADA applies to both federal and state prisons." *Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998)).  However, "Title II of the ADA does not . . . provide for suit against a public official acting in his individual capacity." *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009); *Williams v. McLemore*, 247 Fed.Appx. 1, 8 (6th Cir. 2007) ("the ADA does not permit public employees or supervisors to be sued in their individual capacities."); *Moore v. Chavez*, 36 Fed.Appx. 169, 171 (6th Cir. 2002) ("Title II of the ADA does not provide for individual capacity suits against state officials."); *Carten*, 282 F.3d at 397.

---

[23]Referencing the Sixth Circuit's decision in *Carten*, defendants contend, "it appears that individuals sued in their official capacity may be liable for money damages and equitable relief under Title II if the claims sound in due process."  Doc. Ent. 19 at 5 n.5, 19 at 14 n.34.

In the case at bar, defendants Burton, Rewerts and Wilson are sued in their *individual*, as opposed to *official*, capacities.  Doc. Ent. 1 ¶¶ 4, 6 and 7.[24]  Therefore, he cannot bring a Title II ADA claim against them.  *See, e.g., Everson*, 556 F.3d at 501 n.7; *Williams*, 247 Fed.Appx. at 8; *Moore*, 36 Fed. Appx. at 171.

**c.      The Court need not address the issue of defendants Burton, Rewerts and Wilson's entitlement to qualified immunity.**

**I.      Qualified immunity generally:**  As the United States Supreme Court has stated, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982).[25]

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: "First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."  *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (citing *Dickerson v. McClellan*, 101 F.3d 1151,

---

[24]For some reason, defendants assert that "[p]laintiff has sued [d]efendants Burton, Wilson, and Rewerts in their *individual and official* capacities."  Doc. Ent. 19 at 14 (emphasis added).

[25]Furthermore, "[u]ntil this threshold immunity question is resolved, discovery should not be allowed."  *Harlow*, 457 U.S. at 818-819.

1157-58 (6th Cir.1996)).[26]  *See also Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that

the officials are not entitled to qualified immunity."  *Silberstein v. City of Dayton*, 440 F.3d 306,

311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th

Cir.2004)).

Importantly, the defense of qualified  immunity is best addressed after determining

whether plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he

better approach to resolving cases in which the defense of qualified immunity is raised is to

determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.

Normally, it is only then that a court should ask whether the right allegedly implicated was

clearly established at the time of the events in question."  *County of Sacramento v. Lewis*, 523

U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

**ii.**     **Defendants' argument:** Defendants contend that plaintiff "has not shown that

Defendants violated any clearly established federal statutory or constitutional right."  Doc. Ent.

---

[26]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A
court required to rule upon the qualified immunity issue must consider, then, this threshold
question: Taken in the light most favorable to the party asserting the injury, do the facts alleged
show the officer's conduct violated a constitutional right? This must be the initial inquiry."
*Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  "If no
constitutional right would have been violated were the allegations established, there is no
necessity for further inquiries concerning qualified immunity. On the other hand, if a violation
could be made out on a favorable view of the parties' submissions, the next, sequential step is to
ask whether the right was clearly established."  *Saucier*, 533 U.S. at 201.  *See also Drogosch v.
Metcalf*, 557 F.3d 372, 377 (6th Cir. Feb. 25, 2009) (citing *Saucier*, 533 U.S. at 201).  "The
relevant, dispositive inquiry in determining whether a right is clearly established is whether it
would be clear to a reasonable officer that his conduct was unlawful in the situation he
confronted."  *Saucier*, 533 U.S. at 202.
     Earlier this year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier*
protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is
often beneficial*."  *Pearson v. Callahan*, 129 S.Ct. 808, 818 (Jan. 21, 2009) (emphasis added).

19 at 14-16. With respect to the first prong, defendants maintain that "[i]n this case, . . . Plaintiff's allegations of medical indifference are without merit. As detailed above, Defendants' actions in no way violated any of Plaintiff's constitutional rights." Doc. Ent. 19 at 15-16. As to the third prong, defendants contend that "Plaintiff has not shown that Defendants did anything that was objectively unreasonable; indeed, he can't show that they did *anything* wrong because he never complained to them." Doc. Ent. 19 at 16 (emphasis in original).

In closing, defendants contend, "[n]one of Plaintiff's allegations, or the facts, show that Defendants violated any of Plaintiff's federal statutory or constitutional rights. Defendants are, thus, entitled to qualified immunity and summary judgment." Doc. Ent. 19 at 14-16.

**iii.** **Conclusion:** In his response, plaintiff states that "[t]he courts have held that leaving a prisoner in pain and denying him medical treatment is a violation of the Eighth Amendment." And, plaintiff claims that defendants knew or should have known "what constitutes a violation of the Eighth Amendment." Doc. Ent. 25 ¶ 15. Furthermore, plaintiff states that "[d]ue to the intentional actions of these defendants and the Constitutional Violations of plaintiff's rights, 'immunity' is not available to these defendants." Doc. Ent. 25 ¶ 17.

As can be seen from defendants' motion, defendants' qualified immunity argument largely contends that plaintiff has not satisfied the first prong; in other words, defendants argue that plaintiff has not shown a constitutional violation. Doc. Ent. 19 at 14-16. "Evaluating the defense of qualified immunity on a motion for summary judgment requires that the court 'adopt [ ] ... the plaintiff's version of the facts.'" *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372 (2007)). "'If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning

39

qualified immunity.'" *Id.* (quoting *Saucier*, 533 U.S. at 201).

As noted above, defendants Burton, Rewerts and Wilson are entitled to summary judgment on plaintiff's Eighth Amendment claims against them (Section II.D.4.a), and plaintiff cannot maintain a Title II ADA claim against these defendants in their individual capacities (Section II.D.4.b). Having answered the first prong of the qualified immunity analysis in this manner, there is no need to continue the analysis.

## III.   **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES

40

UNITED STATES MAGISTRATE JUDGE

Dated:9/13/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on September 13, 2011.

s/Eddrey Butts
Case Manager